IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

United States of America )
)
)
)
v. ) No. 18 CR 880
)
Detonya Garrett )
)

Memorandum Opinion and Order

Detonya Garrett is charged with four counts of narcotics and firearms crimes. Before me is his motion to suppress evidence the government obtained as a result of law enforcement's September 11, 2017, search of a Park Forest, Illinois, apartment and the seizure and subsequent search of a safe discovered in an enclosed space under the staircase of that apartment. The government opposes the motion on the grounds that Garrett was a trespasser with no legitimate expectation of privacy in the Park Forest apartment, and that Park Forest police officers entered the apartment with the property owner's permission. After an evidentiary hearing, I allowed the parties to file additional written submissions. Having considered the arguments and evidence of record, I deny the motion for the reasons that follow.

I.

On September 5, 2017, Leonard Hill, a real estate broker with Carrington Real Estate Services ("Carrington"), called the Park Forest police department to report that someone appeared to be occupying a bank-owned property located at 467 Victory Drive, which Carrington had listed for sale on the bank's behalf, and which was supposed to be vacant.[1] Mr. Hill called police after discovering that the locks on the property had been changed; that his key no longer worked; and that the lockbox and Carrington's marketing literature had been removed from the property.

Hill posted a pre-printed notice captioned "Options as an Occupant," to which he added the handwritten words, "you are trespassing," on the front door of the property. Tr. of 11/01/2019 Hr'g. at 9. Hill affixed his business card to the notice and requested the occupant to call him by 5:00 p.m. that day. Hill did not hear from the occupant that day.

Based on the bank's instruction to "work out some reasonable means" to gain entry to the property, *id*. at 16, Hill returned to the property with a police escort the following day. Commander Baugh, one of the officers who accompanied Hill, examined the exterior of the residence and discovered that electric and water

---

[1] Throughout this decision, references to the bank refer to Wilmington Savings Fund Society, FSB, as Trustee of Stanwich Mortgage Loan Trust A. *See* the parties' Stipulation No. 1.

services were functioning. *Id*. at 27. Hill and the officers knocked on the door and rang the doorbell, but no one answered. *Id*. at 12. Hill asked police officers not to force entry at that time, as he believed the occupant was possibly the victim of a scam, *id*. at 17. Hill posted a second "Options as an Occupant" notice on the door, again requesting that the occupant call him that day. Hill also asked the police to perform "residence checks" over the next several days to try and make contact with the occupant, but officers were unable to make contact with anyone at the property. *Id*. at 41.

Two or three days later, Garrett called Hill and asked him to stop posting notices on his door, explaining that he answered an ad on Craigslist to rent the property and was not trespassing. *Id*. at 13, 77. Hill explained that the property was for sale, not for rent. *Id*. at 13. Meanwhile, Commander Baugh directed Officer Malachowski to contact the Park Forest water department to determine who, if anyone, had obtained authorization for water services. *Id*. at 28. The water department informed the officers on two separate occasions that the water service had not been activated legally, so "any water that was on at that residence had been illegally obtained." *Id*. at 28, 29.

On September 11, 2017, Park Forest police officers responded to a call from Nicholas Wolotowsky, a maintenance worker who had been hired by the property owner to shut off the water service and

"winterize" the Victory Drive property.[2] *Id*. at 29-31. Wolotowsky reported hearing voices inside the property as he was drilling the front door lock to gain access to the residence. *Id*. at 31. Police accompanied Wolotowsky inside the house and found it unoccupied, with a television on in an upstairs bedroom, a baggy containing a small quantity of a green leafy substance they suspected (and later confirmed) was marijuana on the TV stand, and other personal effects. *Id*. at 32-33.

Also in the bedroom, the officers found a document purporting to be a lease for 467 Victory Drive, which identified "Thomas Weatherspoon" as the landlord and "Detony Garrett" as the tenant. Together with the lease was a receipt for payment of $3,250 by Detony Garrett to Thomas Weatherspoon with the notation "Deposit for 467 Victory Drive Park Forest." The officers also found utility documents addressed to Detonya Garrett at the Victory Drive address. *Id*. at 43-43, 52-53; Mot., Exh. 1 at 12, DN 25-1.

As officers searched the property, Wolotowsky continued his work, which required him to access the water shutoff valve located in an area behind an access door secured by screws underneath the front staircase. There, Wolotowsky found a safe and alerted the officers to its presence. Commander Baugh seized the safe and took

---

[2] According to the police report Commander Baugh prepared, Wolotowsky informed the officers "that his company had been contracted by the bank to maintain the property." Mot., Exh. 1, at 5.

4

it to the Park Forest police station while Sergeant Sweitzer and Officer Elyyan remained at the property. Garrett later arrived at the property, where he told Sweitzer that he had rented the property from an individual he contacted through Craigslist. *See* Mot., Exh. 1 at 4; H'rg Tr. at 79. Sweitzer advised Garrett to contact the Park Forest Police Department regarding the fraudulent lease of the property. Mot., Exh. 1 at 4.

Garrett testified at the hearing about how he came to reside at 467 Victory Drive. He again stated that he learned of the listing through Craigslist, and that after calling the contact identified in the ad, he made arrangements with "Woody" to visit the property. H'rg Tr. at 69-71. Woody showed Garrett the property and told him the rent would be $1250 per month, with Garrett responsible for utilities. *Id*. at 71. Garrett returned to the property two days later, where he met Woody and "Tommy," signed a lease he did not read, received a receipt for a cash payment, and obtained keys to the property. *Id*. at 72-75. Garrett moved into the property on or around September 1, 2017.

Garrett testified that after receiving Hill's second trespassing notice, he tried contacting Woody then called Hill because he "knew something was going on fishy." *Id*. at 84, 85. Garrett told Hill that he was not trespassing, but he does not claim to have taken any further action to investigate the legitimacy of his claim to the property prior to September 11,

5

when he arrived to find Park Forest police officers there to evict him. Garrett testified that he then called Carrington Bank a few days later and told the person he spoke to that he was "in a fraud situation" and had made arrangements with Hill to remove his belongings from the property. *Id*. at 77, 78.

Meanwhile, Baugh continued his investigation by calling Carrington Real Estate Services, which confirmed that the Victory Drive property was owned by the bank. Commander Baugh also called the Park Forest Building Department and discovered that no occupancy permit had been granted for 467 Victory Drive. Hr'g. Tr. at 37-38.

On October 2, 2017, Alex Bregin of the Investigations Division was assigned to investigate possible criminal activity involving 467 Victory Drive. Bregin spoke with Commander Baugh, reviewed his police reports, and reviewed the residential lease obtained from the property. Baugh observed several irregularities in the document, including that it lacked an address or any contact information for the named landlord, Thomas Weatherspoon; that it lacked a current address for the prospective tenant; and that although the it contained provisions stating, "The landlord agrees to supply the following utilities to the tenant," and "The tenant agrees to obtain and pay for the following utilities," both fields were blank. Mot., Exh. 1 at 14; Hr'g Tr. at 53-54. In addition, Bregin observed that where the lease called for alternative

6

disclosures by the landlord regarding the possible presence of lead-based paint, both alternatives were marked "N/A." Mot., Exh. 1 at 15[3]; Hr'g Tr. at 55-56. Finally, Bregin noted that where the lease provided spaces for the tenant to acknowledge the receipt of certain information and the waiver of certain rights, each of the spaces following the instruction, "Tenant to initial all applicable" contained the typewritten initials "DG." As Bregin observed, these initials appear to have been "typed in as though they were printed with the lease document when it was printed." Hr'g Tr. at 57; *see also* Mot., Exh. 1 at 15. Based on these features, Bregin concluded that the lease was fictitious. Indeed, Bregin was unable to identify a Thomas Weatherspoon in connection with 467 Victory Drive. Hr'g Tr. at 58.

On October 5, 2017, after efforts to reach Garrett were unsuccessful, Detective Bregin and other officers obtained and executed a search warrant on the safe recovered from the Victory Drive property. Its contents included five empty 40-caliber, high-capacity magazines, three clear plastic bags containing a substance suspected (and later confirmed) to be heroin, a

---

[3] The lease reads: "Presence of lead-based paint and/or lead-based paint hazards: (Landlord to initial one)." It then offers two alternatives, each with a space for initials. The alternatives are "Known lead-based paint and/or lead-based paint hazards are resent in building (explain):" and "Landlord has no knowledge of lead-based paint and/or lead-based paint hazards in building." Although one of the other of these alternatives necessarily applies, "N/A" is typed into each of the spaces intended for initials.

7

flashlight that would be mounted to a weapon, and a pencil. DNA taken from the pencil ultimately led investigators to Garrett, who was arrested on October 23, 2018. Further investigation, which included warrant-supported searches of the location at which Garrett was arrested and of a second safe found at that location, led to the charges here.[4]

## II.

Garrett opens his motion with the argument that the police violated the Fourth Amendment by entering the Victory Drive property without a warrant or probable cause to believe that the residence contained evidence of a crime. But this argument omits a critical threshold question, which is whether Garrett had a reasonable expectation of privacy in the Victory Drive residence. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978) (Fourth Amendment claim depends on "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place"); *United States v. Curlin*, 638 F.3d 562, 565 (7th Cir. 2011). Ordinarily, "individuals who occupy a piece of property unlawfully have no claim under the Fourth Amendment." *Curlin*, 638 F.3d at 565 (citing cases); *see also United States v. Sawyer*, 929

---

[4] At the 11/01/2019 hearing, Garrett indicated that his motion to suppress challenges only the validity of the September 11, 2017, search of the Victory Drive property, the seizure of the safe found at that location, and the later search of that safe. Hr'g Tr. at 61.

F.3d 497, 500 (7th Cir. 2019) (noting agreement among several circuits that "a trespasser's wrongful presence forestalls a Fourth Amendment challenge") (citing cases). Garrett does not claim to have had a lawful right to occupy 467 Victory Drive. Instead, he argues that his subjective belief that he had a valid lease on the property entitles him to the Fourth Amendment's protections. But this argument does not withstand scrutiny because Garrett's purported belief in the lawfulness of his occupancy is neither credible nor objectively reasonable.

To begin, by the time police entered the residence on September 11, 2017, Hill had twice advised Garrett that he was trespassing, which—as Garrett concedes—alerted him to the fact that something was "fishy." Hr'g Tr. at 85. Still, several days went by before Garrett tried to contact Hill to investigate. Garrett claims that when he finally spoke to Hill, he told him that he "had a lease with a guy named Woody." *Id*. But "Woody" is not mentioned anywhere in the lease Garrett signed. *See* Mot., Exh. 1 at 13-16. Moreover, Garrett testified that he lost contact with "Woody" just days after signing the lease and paying him $3,250 in cash; yet Garrett did not report "Woody" (or Thomas Weatherspoon for that matter) to the Park Forest Police, nor did he take any legal action to try and recover the money he paid. *Id*., at 59, 84. None of this suggests that Garrett genuinely believed he had been

9

swindled out of thousands of dollars in a fraudulent lease that he subjectively believed was legitimate.

Moreover, Garrett's claimed belief in the bona fides of his lease is objectively unreasonable. Even assuming that Garrett, a 39-year-old man, had never signed a lease and was an unsophisticated, first-time renter, the deficiencies in the lease are so glaring that no reasonable person could have believed it was legitimate. For starters, the lease provided no contact information for either "Woody" or the named landlord, Thomas Weatherspoon. Further, as described above, several of the provisions are filled out in a nonsensical or suspicious fashion. Perhaps most telling of all is the fact that the "Tenant's Acknowledgment" provisions contain Garrett's initials typed directly onto the printed document. As Detective Bregin testified, these factors led him to believe that the lease was fraudulent, and that Garrett was a participant in the fraud, rather than a victim of it. Hr'g. Tr. at 53-58; Def.'s Mot., Exh. 1 at 6 ("It is Det. Bregin's belief that Garret[t] typed and printed a fictitious lease in order to obtain utility services and occupy the residence at 467 Victory Dr.").

Garrett's cited authorities do not persuade me that the circumstances here warrant departure from the general rule that a "wrongful" occupant has no legitimate expectation of privacy in the occupied property. *Rakas*, 439 U.S. at 141 n. 9. For example,

Garrett cites *Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018), for the proposition that Fourth Amendment rights "do not turn on the intricacies of property law." Def.'s Mem. at 7. In *Byrd*, the Court rejected the argument that the driver and sole occupant of a rental car could have no legitimate expectation of privacy at the time the car was searched simply because he was not named as an authorized driver on the rental agreement. *Id*. at 1528. The Court acknowledged that a defendant's "'wrongful' presence at the scene of a search would not enable a defendant to object to the legality of the search," *id*. at 1529 (quoting *Rakas*, 439 U.S. at 141, n.9), but reasoned that not every breach of a car rental agreement establishes that the driver's presence in the car is "wrongful" for purposes of the Fourth Amendment. *Id*. at 1529. Here, however, the government does not argue that Garrett's occupancy of 467 Victory Drive was unlawful because it breached some provision of the lease agreement. The government's position is that Garrett's occupancy was wrongful because the lease was a sham to begin with, and Garrett knew it. As noted above, the evidence supports this interpretation of the facts. Garrett's citation to *Hoffman v. Altamore*, 815 N.E. 2d 984 (Ill. App. Ct. 2004), for the proposition that "an occupant does not become a trespasser simply because the lease expired or is violated," Def.'s Mem. at 8, misses the mark for similar reasons.

Garrett's remaining cases are equally unpersuasive. *Ryan v. Mary Immaculate Queen Center*, 188 F.3d 857 (7th Cir. 1999), is inapposite, as the court's central ruling in that case was that the plaintiffs could claim Fourth Amendment violations arising out of their landlord's unlawful search of their apartment, despite the fact that nothing was seized. *Id*. at 859. The court's observation that the plaintiffs had "standing to contest the search" because the landlord had not yet obtained "a valid order granting him exclusive possession of the premises" merely reaffirms that a legitimate tenant maintains his or her tenancy rights—including the right to exclude-until they are formally extinguished. It does not create such rights where none exist. In *United States v. Washington*, 573 F.3d 279 (6th Cir. 2009), the court concluded that the defendant, who was residing at his uncle's apartment with his uncle's permission, was not a trespasser merely because the uncle's lease prohibited tenants from engaging in unlawful activity. Again, that scenario bears no resemblance to the facts here, as Garrett had no permission from anyone with a lawful property interest in 467 Victory Drive to occupy the residence.[5]

---

[5] I have reviewed the remaining cases Garrett asserts in this connection and conclude that none of them supports his claim of a legitimate expectation of privacy.

Because I conclude that Garrett lacked a legitimate expectation of privacy in the Victory Drive property, I need not reach his remaining arguments. Nevertheless, I note that the evidence establishes that the Park Forest police entered the Victory Drive property with the actual authority of the property owner—a fact that distinguishes this case from those Garrett cites to argue that the officers could not rely on Wolotowsky's permission to enter the property. *See, e.g., Montville v. Lewis*, 87 F.3d 900 (7th Cir. 1997) (property owner sued city building inspectors based on search conducted with permission of contractor); *U.S. v. Jones*, 335 F.3d 527, 529 (6th Cir. 2003) (after defendant denied officers consent to search his residence, officers entered based on consent of handyman who told officers he was "there to clean up the house").

For the foregoing reasons, defendant's motion to suppress is denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: December 16, 2019